| Torres v Home Health Care Servs. of NY |
| :---: |
| 2024 NY Slip Op 31520(U) |
| April 29, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 516970/2021 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

**At an IAS Term, Part 15 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 29th day of April 2024.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------------X
GINA TORRES, as Administratrix of the Estate of ANA B. TORRES,

      Plaintiff,

  -against-

HOME HEALTH CARE SERVICES OF NY, ST. LUKE'S ROOSEVELT HOSPITAL CENTER d/b/a MOUNT SINAI MORNINGSIDE and MOUNT SINAI ST. LUKE'S HOSPITAL,

     Defendants.
-----------------------------------------------------------------------------X
**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

**DECISION & ORDER**

Index No. 516970/2021
Mo. Seq. 2

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u> 41-66

     Defendants St. Luke's Roosevelt Hospital Center d/b/a Mount Sinai Morningside and Mount Sinai St. Luke's Hospital ("Mount Sinai" or "Movants") move (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing Plaintiff's complaint in its entirety against the movants. Plaintiff opposes the motion.

     Gina Torres commenced this action, as administrator of the estate of Ana B. Torres ("Decedent"), on July 9, 2021, asserting claims of medical malpractice against Mount Sinai and others. Decedent was admitted to Mount Sinai from January 11 through January 23, 2019, and from February 18 through March 1, 2019. The complaint alleges that Mount Sinai, through its employees and agents, departed from good and accepted medical standards in preventing and treating pressure ulcers during those admissions.

1

[* 1]

Decedent was admitted to Mount Sinai on January 11, 2019, with "worsening mental status" and weakness (Exhibit G, at 188). She had a history of prior cerebrovascular accident (stroke), hypertension, hyperlipidemia, diabetes mellitus, seizures, and was deemed non-verbal and bedbound with "advanced dementia" (*id.*). She was noted to have "deep bedsores to coccyx area w/ drainage" on admission to the emergency department and was evaluated as requiring inpatient hospital admission due to the "severity of the present illness" (*id.*, at 186). The emergency department nurse recorded on January 11 that Decedent had an unstageable sacral ulcer measuring 6x9 cm, "purplish/bluish in color with foul smell," which had developed 3-4 days earlier according to her son (*id.,* at 190).

Decedent was assessed by a wound care consultant on January 12. The unstageable sacral ulcer measuring 6x9 cm was noted to have well-defined wound edges, eschar, a "malodorous" smell, slight erythema of the surrounding area, and minimal serosanguinous drainage (*id.*, at 236). She had additional deep tissue injuries on her right heel and left heel, each measuring approximately 3x3 cm (*id.,* at 236-237). A plan of care was implemented which included turning and repositioning every two hours, an air mattress, bilateral heel protectors, and skin assessments every eight hours (*id.,* at 624).

Throughout her first admission, Decedent was documented as receiving standard "pressure injury prevention interventions" including turning and positioning "every two hours if bed bound." Her existing pressure injuries were assessed regularly from January 11 through January 23, recording the presence of eschar/slough, the state of surrounding skin, dressing changes, cleansing and debridement of the wound, signs of acute infection (or absence thereof), and turning and positioning protocols, as seen in the nursing flowsheets (*id.*, at 490-510).

On admission, Decedent also tested positive for E.coli urinary tract infection and was treated with ceftriaxone. On January 14, a fever spike prompted further testing, and coagulase-negative staph bacterium was found in some of her blood cultures. Infectious disease consult Michael Williams, M.D. noted the sacral wound, which now measured 8x9 cm, as a "possible source" of infection. Ceftriaxone was discontinued and she was given IV vancomycin and other antibiotics for the rest of her admission. On January 17, an abdominal and

2

pelvic CT scan revealed a "large sacral decubitus ulcer extending down to bone, consistent with osteomyelitis" (*id.* at 720). Her diagnosis was updated to sepsis secondary to sacral osteomyelitis. She continued to be treated with IV antibiotics and enzymatic debridement of the wound.

On January 23, Decedent was recorded to be clinically improved, without fever, and medically stable to be discharged to the New Jewish Home nursing facility, where she would continue a six-week course of antibiotics and wound care.

On February 18, 2019, Decedent was admitted to Mount Sinai again with sepsis secondary to pneumonia (*id.*, at 959, 967). She was also noted to have a stage 4 sacral pressure ulcer with osteomyelitis diagnosed on her prior admission. Her existing sacral pressure ulcer and bilateral heel pressure ulcers were assessed by a wound care specialist on February 19. On February 23, her progress notes read "poor prognosis, unlikely to ever heal or have meaningful recovery of function." During this admission, a DNR/DNI was signed by Decedent's family on February 26, and her treatment was focused on palliative care "with hospice referral given extent of sacral wound" (*id.*, at 967). She was discharged from Mount Sinai to the Dawn Greene Hospice on March 1 and passed away on March 7, 2019.

Plaintiff-administrator alleges that Mount Sinai departed from the standard of care in their prevention and treatment of Decedent's pressure ulcers, and further alleges that these departures caused the development and/or worsening of said ulcers.

"In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (*Hutchinson v. New York City Health and Hosps. Corp.*, 172 AD3d 1037, 1039 [2d Dept. 2019], quoting *Stukas*). "Thus, in moving for summary judgment, a physician defendant must establish, prima facie, 'either that there was no departure or that any departure was not a proximate cause of the plaintiff's injuries'" (*id.,* quoting *Lesniak v. Stockholm Obstetrics & Gynecological Servs., P.C.,* 132 AD3d 959, 960 [2d Dept. 2015]). "In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden" (*Bowe v Brooklyn United Methodist*

3

[* 3]

*Church Home,* 150 AD3d 1067, 1068 [2d Dept 2017]).” “Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact” (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotes and citations omitted]).

In support of this motion, Mount Sinai submits an expert affirmation from Dial Hewlett, Jr., M.D. (“Dr. Hewlett”), a New York licensed physician who is board certified in internal medicine and infectious diseases, as well as relevant medical records and deposition transcripts.

Based upon a review of the records and medical expertise, Dr. Hewlett opines that there were no departures from good and accepted standards in the treatment and care of Decedent while she was a patient at Mount Sinai. From the time of her initial presentation on January 11, she already had a large, unstageable sacral pressure ulcer, as well as bilateral heel pressure ulcers. This sacral pressure ulcer was present for 3-4 days before her admission and already appeared “foul-smelling” and infected. It was also noted by an attending physician on January 12 that Decedent’s daughters stated she may have lain “in her own excrement for extended periods of time at home while seated or lying in bed” (Exhibit G, at 230). Dr. Hewlett opines that Decedent’s high blood sugar, a condition which predisposes diabetic patients to ulcers and inhibits healing, was treated immediately. She was also started on the antibiotic ceftriaxone to treat her E.coli urine infection and suspected infection from the sacral ulcer. Dr. Hewlett opines that this was an “acceptable medication” to treat “both potential pathogens.”

Dr. Hewlett opines that the Mount Sinai staff also “properly, appropriately, and timely implemented a care plan” to address her existing pressure ulcers and prevent the formation of new ones. From January 11 through January 23, the nursing flowsheets demonstrate that this care included periodic skin assessments, turning and repositioning, using cleansing agents (saline, saf-gel, and enzymatic debrider), changing her dressings and linens, and maintaining adequate hydration and nutrition assisted by a feeding tube. Dr. Hewlett notes that there is no indication that *any new* pressure ulcers developed while Decedent was at Mount Sinai, nor that her preexisting pressure ulcers worsened. Although the sacral ulcer was ultimately diagnosed as infected, he opines that this

4

infection predated her admission to Mount Sinai, given the state of the wound when she was admitted and the discovery of sacral osteomyelitis in her CT scan. Dr. Hewlett also opines that there were timely and proper consultations with wound care and infectious disease specialists, whose recommendations were implemented.

Dr. Hewlett opines that her treatment was appropriately reevaluated after her fever spiked on January 14 and new blood cultures were obtained. Dr. Hewlett opines that the decision to treat Decedent with vancomycin by IV and to discontinue ceftriaxone was in accordance with the standard of care for her multiple sources of infection. The expert further opines that this medication "staved off the decedent from developing septic shock," and that a six-week "aggressive course of treatment" was ordered and implemented, including a daily antibiotic that would be easier to administer after her discharge to the nursing home.

When Decedent was readmitted on February 18, Dr. Hewlett notes that this readmission "was for her development of aspiration pneumonia and unrelated to the decedent's decubitus ulcers." Dr. Hewlett also notes that her plan of care during the second admission was palliative in nature and she was placed in hospice care at her family's decision. He opines that at this time "treatment was in the form of making her as comfortable as possible," and there were no departures from the standard of care from that second admission through her discharge to the Dawn Greene Hospice on March 1, 2019.

Additionally, Dr. Hewlett opines that no acts or omissions of the Mount Sinai staff were a proximate cause of Decedent's development of sacral osteomyelitis. He opines, based on the facts in the record, that this condition "predated the decedent's admission to the hospital on January 11, 2019." The description of her large sacral ulcer, the fact it had been present for multiple days, the evidence on record that it had been "in contact with feces," and the foul/odorous condition of the wound upon her admission is consistent with a pressure ulcer which had already progressed to a severe stage and did not first develop or become infected during her admission. The expert opines that Decedent's pelvic CT scan on January 17 merely confirmed the presence of sacral osteomyelitis, and "there was simply nothing that could have been done" on the part of Mount Sinai to prevent it.

Mount Sinai has established a prima facie case for summary judgment, based on the expert's submissions that all treatment and care rendered to Decedent was in accordance with good and accepted medical standards.

5

The expert also establishes prima facie that Decedent's pressure ulcers and sacral osteomyelitis were preexisting and not proximately caused by any departures from the standard of care by Mount Sinai.

In opposition, Plaintiff submits an expert affirmation from a licensed physician certified in internal medicine and geriatric medicine, (name of expert redacted). The Court was presented with the signed, unredacted affirmation for *in camera* inspection.

Plaintiff's expert opines that Mount Sinai departed from good and accepted medical practice in the treatment rendered to Decedent during her admissions. Specifically, Plaintiff's expert opines that Mount Sinai staff failed to document "accurate and consistent staging and sizing" of Decedent's pressure ulcers. The sacral ulcer was assessed as "unstageable" throughout her first admission and the wounds' precise measurements were only noted on January 11, 12, 15, and 16, while the measurements of her heel pressure injuries were only noted on January 11 and 12.

Plaintiff's expert also states that Decedent was not provided a pressure-reducing mattress during her first admission, and the expert opines that this was a departure from the standard of care, because Decedent's high risk for development and/or deterioration of pressure ulcers required the use of a "pressure redistributing mattress" *and/or* "other pressure relief safety devices."

Finally, Plaintiff's expert opines that during her January admission, Mount Sinai did not comply with their own care plan of turning and positioning Decedent every two hours, and that such failure to turn the body "leads to unabated pressure on the sacrum and heels, the very places sores appeared" on the decedent. Furthermore, Plaintiff's expert opines that Decedent should have been turned *more* frequently than every two hours, and that it was a departure from the standard of care to not reevaluate her and implement a more frequent turning and positioning schedule.

Plaintiff does not address any allegations of malpractice related to Decedent's second admission in Mount Sinai from February 18 to March 1, nor does Plaintiff's expert counter Dr. Hewlett's opinions that there were no departures from the standard of care in her treatment at that time. Plaintiff also offers no expert opinion as to any of the medications prescribed to Decedent, the timeliness of consultations with specialists, the cleansing and

6

debridement of her pressure ulcers, or the maintenance of proper nutrition and hydration. Therefore, Plaintiff does not defeat the movants' prima facie case that these interventions were in accordance with good and accepted medical standards.

Plaintiff's expert generally places more focus on the *documentation* of Decedent's care than treatment rendered. The expert does not dispute that Mount Sinai's records show a care plan for pressure ulcer prevention, including turning every two hours, was ordered from the start of Decedent's admission. However, the expert argues that these records do not specify "when, if at all, these interventions were actually performed," because there is no record of each individual time the patient was turned and repositioned, only nursing flowsheets at "random increments, usually at least eight hours apart" which state the protocol is being followed. Plaintiff's expert opines that it was a deviation from accepted medical practice not to keep "a usable record which allows each caregiver to determine when the patient had been turned and positioned and into which position the patient was placed," and states in a conclusory manner that this failure to enter such a record every two hours was "the proximate cause of the deterioration of Plaintiff's decedent's pressure ulcers."

The plaintiff's expert mischaracterizes the nursing flowsheets by stating that Decedent was only turned and repositioned once or twice on certain days, rather than every two hours. The notes on each of those dates include a standard protocol which begins "Turn and positioned, weight changed *every two hours if bed bound* and every one hour if chair bound." Even viewing the evidence in the light most favorable to the non-moving plaintiff, there is no issue of fact merely because additional notes were not entered at each two-hour period confirming that Decedent was turned. As defendant argues in reply, courts have held that a "failure to document each element of the skin care protocol does not equate to a failure to perform each element or to a cause of the ulcer itself" (*Braunstein v Maimonides Medical Center,* 161 AD3d 675 [1st Dept 2018]). Plaintiff's argument that the movants' failure to keep more extensive records constituted malpractice, because caregivers might not have been able to keep track of the times and directions she was turned, is speculative.

Plaintiff's expert opinion is also vague and conclusory as to the standard of care for ordering *more frequent* turning and repositioning. The expert states that turning should have taken place "more frequently, if, as in the

7

case of Plaintiff's decedent, the two-hour turning schedule has failed." However, Plaintiff's expert does not go into detail about how or when Mount Sinai's two-hour turning schedule did "fail," as there is no evidence that she developed new pressure ulcers during her admission. Plaintiff's expert also opines that there should have been "a written, detailed turning and positioning schedule" based on the Decedent's "postural alignment, distribution of weight, balance, and stability," but this opinion is conclusory and without detail as to how it applies to Decedent's case and the alleged deterioration of her pressure ulcers.

The opinions of plaintiff's expert are similarly conclusory on the staff's alleged failure to "accurately and consistently stage and/or size" the Decedent's pressure ulcers. Decedent's pressure ulcers were assessed as "unstageable" on admission and throughout her records, which the expert does not address in any detail as a departure from the standard of care. The expert also does not cite to inaccuracies or inconsistencies in sizing, only the fact that measurements were not taken and/or documented each day. The three ulcers' measurements were recorded by a wound care specialist on the second day of her admission, and the sacral ulcer was measured again on January 15. The expert opines in a conclusory manner that staging and sizing is necessary to ensure existing pressure ulcers are "aggressively met with the appropriate level of treatment," but does not address how frequently such staging and sizing should occur or what additional treatment opportunities were missed, given the status of Decedent's pressure ulcers when she was admitted. Plaintiff's expert never addresses the cleansing, debridement, or other treatment measures in the record and does not counter the movants' expert opinion that these measures were appropriately aggressive.

Plaintiff's expert opines without factual support that the patient did not receive an air mattress or other pressure relief devices. Plaintiff's expert cites only to two entries in the nursing chart which stated the patient qualified for a "specialty bed," while the rest of the chart stated she only required a "standard bed." However, the opinion of plaintiff's expert that a "specialty bed" was synonymous with the type of *mattress* used or was in any way related to pressure ulcer care is purely speculative. There is no indication in the record, as suggested by the expert, that Decedent was not provided with an air mattress and bilateral heel protectors as noted in her plan of care. Therefore, Plaintiff's argument that she received no pressure relief devices is speculative and not supported

8

by the record.

Furthermore, the expert's opinion is wholly conclusory as to how any of these alleged departures, even if they occurred, were a proximate cause of the deterioration of Decedents' pressure ulcers and/or the development of sacral osteomyelitis. Plaintiff's medical expert is not an infectious disease specialist and does not offer any opinions to refute the defendant's affirmation from Dr. Hewlett on this issue. Plaintiff's expert broadly counters the causation argument by opining that Decedent's other comorbidities do not "cause" pressure ulcers, and only "unrelieved pressure causes pressure ulcers." The expert states in a conclusory manner that Decedent's "skin breakdown and/or deterioration was caused by unrelieved pressure" and "could have been avoided with the proper medical and nursing care," but does not adequately address the timeline or specifics of her skin breakdown. The bare facts are that Decedent *entered Mount Sinai* with a large sacral pressure ulcer, exhibiting necrotic tissue and a malodorous smell, as well as two heel pressure ulcers. These pressure ulcers did not form during her Mount Sinai admission, and Plaintiff's expert is vague and conclusory as to how they "deteriorated" or worsened as a result of Mount Sinai's actions. Crucially, the plaintiff's expert does not address Dr. Hewlett's medical opinion that the sacral wound was already infected to the bone before Decedent was admitted, even if that infection was not confirmed until her CT scan. Plaintiff's expert does not address Dr. Hewlett's opinion that Decedent's sacral osteomyelitis was a condition that *predated* her admission to Mount Sinai, not the result of any skin breakdown caused by the moving defendants. Because Plaintiff's expert fails to draw any causative link from Mount Sinai's alleged departures to counter this opinion from Dr. Hewlett, there is no issue of fact as to proximate causation.

For these reasons, Plaintiff has not raised any triable issues of fact to preclude summary judgment, and therefore, Mount Sinai's motion is granted.

It is hereby:

**ORDERED** that the motion of Defendants St. Luke's Roosevelt Hospital Center d/b/a Mount Sinai Morningside and Mount Sinai St. Luke's Hospital (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting

9

[* 9]

summary judgment and dismissing Plaintiff's complaint as against the movants, is **GRANTED**.

The Clerk is directed to enter judgment in favor of St. Luke's Roosevelt Hospital Center d/b/a Mount Sinai Morningside and Mount Sinai St. Luke's Hospital.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

10

[* 10]